1

2

3

4

5

6

7

8                             UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   AMANDA DAWSON, GARRETT              Case No.  1:20-CV-372-BAM
     WOODRAL, DUSTIN WOODRAL,
12                                       **ORDER ON CROSS MOTIONS FOR**
                   Plaintiffs,           **SUMMARY JUDGMENT**
13
            v.                           (Doc. Nos. 31, 32)
14
     COUNTY OF STANISLAUS, NATHAN
15   CRAIN,

16                 Defendants.

17

18          Plaintiffs Amanda Dawson, Garrett Woodral, and Dustin Woodral (collectively,

19   "Plaintiffs") bring this civil action alleging a violation of their civil rights in connection with an

20   allegedly unlawful attack by a Stanislaus County police dog on Donnie Woodral ("Mr. Woodral")

21   during a traffic stop.  The parties' cross-motions for summary judgment and summary

22   adjudication have been fully briefed and are now pending before the Court.[1]  (Docs. 31-32, 36,

23   38, 40-41.)

24          Having considered the record, the parties' briefs and arguments, and the relevant law, the

25   Court DENIES Plaintiffs' motion for partial summary adjudication in its entirety, and GRANTS

26   IN PART and DENIES IN PART Defendants' motion for summary judgment.

27   ─────────────────────

28   [1]     The parties have consented.to the jurisdiction of the United States Magistrate Judge for all
     purposes pursuant to 28 U.S.C. § 636(c).  (Docs. 13, 53-54.)

                                                   1

1

**I.       BACKGROUND**

2       Plaintiffs initiated this action on March 11, 2020.  (Doc. 1.)  According to Plaintiffs' First

3    Amended Complaint, Mr. Woodral was driving when Stanislaus County deputies pulled him

4    over.  (Doc. 18 ¶ 1.)   In fear of prior encounters with abusive deputies, Mr. Woodral ran into a

5    field.  *Id.*  Deputies released a police dog to follow Mr. Woodral, who was unarmed.  *Id.*  The dog

6    attacked Mr. Woodral and continued to attack him even after deputies had arrived.  *Id.*  Deputies

7    permitted the dog to continue to bite Mr. Woodral until the dog bit off Mr. Woodral's thumb.  *Id.*

8    Despite this injury, deputies refused to summon emergency medical attention. (Doc. 18 ¶ 2.)

9    After waiting a significant amount of time, Mr. Woodral was seen by doctors, who attempted to

10   reattach his thumb.  *Id.*  Mr. Woodral's thumb, although reattached, can no longer be moved, bent

11   or otherwise controlled.  *Id.*  Furthermore, the police dog bit Mr. Woodral's stomach causing

12   significant damages and scarring.  *Id.*

13       Plaintiffs allege the following claims:  (1) violations of the Fourth Amendment for

14   Excessive Force under 42 U.S.C. § 1983 against Defendant Nathan Crain; (2) municipal and

15   supervisory liability under 42 U.S.C. § 1983 against Defendant County of Stanislaus ("*Monell*

16   liability" or "*Monell* claim"); (3) state civil rights violations under California Civil Code § 52.1,

17   the Bane Act, against Defendants Nathan Crain and County of Stanislaus; (4) battery against

18   Defendants Nathan Crain and County of Stanislaus, in violation of California Penal Code § 242;

19   and (5) negligence against Defendants Nathan Crain and County of Stanislaus.  (Doc. 18.)

20       Plaintiffs now move for partial summary adjudication against Defendants as to the

21   liability portion of their excessive force, negligence, and *Monell* claims pursuant to Federal Rule

22   of Civil Procedure 56.  (Doc. 32.)  Defendants oppose the motion, arguing that Plaintiffs are not

23   entitled to summary adjudication as reasonable force was used.  (Doc. 36.)  Plaintiffs replied.

24   (Doc. 40.)   Defendants concurrently move for summary judgment on all of Plaintiffs' claims.

25   (Doc. 31.)   Plaintiffs opposed the motion, and Defendants replied.  (Docs. 38, 41.)

26       On September 27, 2022, initial Plaintiff Donnie Woodral's children Amanda Dawson,

27   Garrett Woodral, and Dustin Woodral were substituted for Donnie Woodral in this action as

28   plaintiffs following Donnie Woodral's death.  (Doc. 51.)  On January 6, 2023, the parties filed a

1    stipulation of dismissal as to Plaintiffs' negligence claim against Defendants Crain and Stanislaus

2    County.  (Doc. 62.)

3    **II.      SUMMARY JUDGMENT EVIDENCE**

4    Based upon the parties' Joint Statement of Undisputed Material Facts, Donnie Woodral

5    was on supervised custodial release from state prison under Post Release Community Supervision

6    and wore a GPS tracked ankle monitor on February 2, 2019.  (Doc. 31-3, Joint Statement of Joint

7    Undisputed Facts ("UF") ¶ 1.)  Mr. Woodral was also out on bail for a 10851 CVC investigation

8    involving a big rig and prior gas theft cases, and was a suspect in an investigation of a stolen fuel

9    trailer conducted by Stanislaus County Sheriff;s Deputy.  (UF ¶ 2.)

10   On the afternoon of February 2, 2019, Mr. Woodral was in possession of a stolen white

11   Chevy Silverado truck and stolen 2018 Thunder Creek Fuel Trailer.  (UF ¶¶ 3-4.)  Mr. Woodral

12   attempted to evade arrest by driving the stolen truck and trailer, in which he was accompanied by

13   Dennis Herd, onto a dirt road in an orchard. (UF ¶¶ 6-7.)  The parties' versions of the remaining

14   events diverge.

15   **A.  Plaintiffs' Version of Events[2]**

16   Mr. Woodral drove down a dirt road on top of an irrigation canal while being pursued by

17   deputies.  (Doc. 32-8, Plaintiffs' Statement of Separate Undisputed Facts, ("PSSUF") ¶ 4.)  At

18   that time, Defendant Crain had not received any information that anyone inside the truck was

19   armed.  (PSSUF ¶ 3.)  A helicopter operated by the Stanislaus County Sheriff's Department

20   joined the pursuit, spotting Mr. Woodral as he drove on the dirt road.  (PSSUF ¶ 5.)  Mr. Woodral

21   continued to attempt to evade arrest, driving the stolen truck and trailer on the dirt road in an

22   orchard.  (PSSUF ¶ 6.)  Mr. Woodral eventually pulled the truck to the side of the road and began

23   fleeing on foot through a nearby orchard.  (PSSUF ¶ 6.)  Defendant Crain drove down a dirt road

24   that cut through the orchard, roughly paralleling Mr. Woodral as he ran.  (PSSUF ¶ 7.)  Soon

25   after, Defendant Crain spotted Mr. Woodral standing behind a tree.  (PSSUF ¶ 8.)

26   _____

27   [2]       Unless otherwise noted, Plaintiffs' version of events is derived primarily from their Statement of Separate
     Undisputed Facts ("PSSUF") and Joint Statement of Undisputed Facts ("UF") in support of their motion for partial
     summary adjudication.  It is consistent with the version of events as set forth in their motion for partial summary

28   adjudication and opposition to Defendants' motion for summary judgment.  (Docs. 32, 38.)

As Mr. Woodral began running again, Defendant Crain got out of his vehicle and released his dog. (PSSUF ¶ 9.) Within five seconds of being released, the police dog made contact with Mr. Woodral. (PSSUF ¶ 10.) The dog bit Mr. Woodral's stomach, latching on as it took him to the ground. (PSSUF ¶ 11.) Mr. Woodral was unable to move because the dog was biting him while he laid on the ground on his back. (PSSUF ¶ 12.) The dog bit Mr. Woodral's right hand and arm for approximately 14 seconds before Defendant Crain reached Mr. Woodral and the dog. (PSSUF ¶ 13.) As he approached, Defendant Crain commanded Mr. Woodral to get on his stomach. (PSSUF ¶ 14; UF ¶ 12.) Mr. Woodral complied, rolling over to his stomach as the dog continued biting his arm. (PSSUF ¶ 15.) Mr. Woodral begged Defendant Crain to get the dog off of him and told Defendant Crain that he was not trying to run anymore. (PSSUF ¶ 16.) At that time, Mr. Woodral was not resisting arrest. (PSSUF ¶ 17.) Defendant Crain straddled the dog and picked it up by its vest while it continued biting Mr. Woodral's arm. (PSSUF ¶ 18.)

Defendant Crain held the dog like this for approximately 18 seconds before the dog released its bite. (*Id.*) In total, the dog bit and held Mr. Woodral for approximately 30-32 seconds. (PSSUF ¶ 19; UF ¶ 11.) Though Mr. Woodral was compliant, Defendant Crain did not order the dog to release its bite because he was waiting for a fellow nearby deputy to come handcuff Mr. Woodral. (PSSUF ¶ 25, UF ¶ 14.)

Defendant Crain did not recall having to order the dog to release its bite of Mr. Woodral more than once and testified that he could not recall a single previous instance where this dog had failed to comply with the first order to release its bite. (PSSUF ¶¶ 20-21; UF ¶ 13.) Defendant Crain further testified that it ordinarily takes the dog "a couple of seconds" to release its bite. (PSSUF ¶ 22; Doc. 32-1, Ex. 1, Deposition of Nathan Crain at 77-78.)   Defendant Crain testified that he has been trained that he is not permitted to continue using force against a person who is compliant, and he would not continue striking a suspect on the ground with a baton once the suspect became compliant. (PSSUF ¶ 23.)   Defendant Crain also testified that he may not have ordered the dog to release its bite of Mr. Woodral even after Mr. Woodral was compliant because Mr. Woodral was not yet in handcuffs. (PSSUF ¶ 24.) Defendant Crain testified that allowing the dog to stay on its bite even after Mr. Woodral complied and Defendant Crain waited for

another deputy conformed with Defendant Stanislaus County's policy and training.  (PSSUF ¶ 26.)  Defendant Stanislaus County trained Defendant Crain that determining when the duration of a police dog bite becomes excessive is analyzed under the same framework as other uses of force. (PSSUF ¶ 27.)

As a result of the dog mauling, Mr. Woodral sustained injuries.  (UF ¶ 10.)  Principally, Mr. Woodral suffered a severe injury to his dominant right hand.  (PSSUF ¶ 28.)  Mr. Woodral's thumb was left with ligaments hanging out of it after the dog attack.  (PSSUF ¶ 29.)  Mr. Woodral was treated by paramedics at the scene of the incident and then transported to Doctor's Medical Center in Modesto by ambulance.  (UF ¶ 16.)  Mr. Woodral was admitted to the hospital, and on February 3, 2019, Dr. Frazier performed surgery on Mr. Woodral's right thumb and ring finger. (UF ¶ 17.)

These injuries caused long-term effects to Mr. Woodral's hand and fingers.  After treatment, Mr. Woodral no longer had feeling in his thumb, and he could not bend it.  (PSSUF ¶ 29.)  Mr. Woodral could not make a fist with his right hand and could not pick up more than four pounds with it.  (PSSUF ¶ 30.)  Mr. Woodral also struggled to write his own name with his injured hand.  (PSSUF ¶ 31.)

**B.  Defendants' Version of Events[3]**

Defendant Crain followed Mr. Woodral's truck, turning off Albers Road and onto a dirt road on a canal bank, next to an orchard.  (Doc. 31-2, Defendants' Separate Statement of Undisputed Material Facts ("DSSUF") ¶ 13.)  While Defendant Crain was following, the truck attempted to pull off the canal road and immediately became stuck in the mud.  (DSSUF ¶ 15.)  Defendant Crain observed a male in a dark shirt, later identified as Mr. Woodral, jump out of the driver's side and run westbound into the orchard.  (*Id.*)  Defendant Crain also observed a second subject exit the truck and run westbound into the orchard.  (*Id.*)  Defendant Crain then drove down an orchard road to set a perimeter approximately 200 yards west of where Mr. Woodral had

---

[3]  Unless otherwise noted, Defendants' version of events is derived primarily from their Separate Statement of Undisputed Material Facts ("DSSUF"), referenced above, in support of their motion for summary judgment and the Joint Statement of Undisputed Facts ("UF").  (Doc. No. 31-2 and 31-3.)  It is consistent with the version of events as set forth in Defendants' opposition to Plaintiffs' motion for partial summary adjudication.  (Docs. 31, 36.)

1    stopped, to try to contain the two subjects as they fled on foot. (DSSUF ¶ 16.) Air101 also

2    followed Mr. Woodral overhead as he ran through the orchard and made announcements

3    instructing Mr. Woodral to surrender. (DSSUF ¶ 17.)

4         Defendant Crain stopped his clearly marked vehicle approximately 25 feet away from Mr.

5    Woodral. (DSSUF ¶ 18.) Mr. Woodral looked to be trying to hide behind a tree. *(Id.)*

6    Defendant Crain observed that Mr. Woodral appeared to see him pull up, then Mr. Woodral

7    darted in the opposite direction away from Deputy Crain. *(Id.)* Defendant Crain quickly exited

8    his patrol vehicle and made a K9 announcement: "Sheriff K9, stop or you'll get bit." (DSSUF ¶

9    19.) Mr. Woodral did not stop in response to Defendant Crain's K9 announcement. (DSSUF ¶

10   20.)

11        At this time, Defendant Crain was aware that Mr. Woodral had fled from arrest by

12   Stanislaus County Sheriff's Department several months prior. (DSSUF ¶ 21.) Defendant Crain

13   was also aware that Mr. Woodral was a fleeing felon who had tried to evade arrest by driving

14   haphazardly, who ignored law enforcement announcements and who continued to attempt to

15   evade arrest by running through the orchard as the Sheriff's helicopter was overhead. *(Id.)*

16   Defendant Crain could not see the second subject who was also somewhere in the orchard. *(Id.)*

17   Defendant Crain therefore released K9 Colt and commanded him to bite in order to apprehend

18   Mr. Woodral. *(Id.)* Defendant Crain ran after K9 Colt and tried to maintain sight of him through

19   the tree branches of the orchard as K9 Colt chased Mr. Woodral. *(Id.)* Though Defendant

20   Crain's view was obstructed by tree branches, and he could not see the instant that K9 Colt made

21   contact with Mr. Woodral, Defendant Crain heard a male yell, "get this dog off me." (DSSUF ¶

22   22.)

23        When Defendant Crain arrived at the apprehension location in the orchard, he saw that

24   Mr. Woodral was down on the ground as K9 Colt maintained his bite on Mr. Woodral's right arm

25   below the elbow. (DSSUF ¶ 23.) Defendant Crain then gave instructions to Mr. Woodral to lie

26   on his stomach. *(Id.)* When Defendant Crain gave the command, no other deputies were in the

27   immediate vicinity, Mr. Woodral had not been searched for weapons, and Mr. Woodral never

28   declared that he was unarmed. (DSSUF ¶ 24.)

6

1        At that point, Defendant Crain did not believe it was practical to release K9 Colt and

2   search Mr. Woodral on his own without waiting for another deputy to arrive.  (DSSUF ¶ 25.)

3   Defendant Crain also did not know if the second subject was nearby.  *(Id.)*  Based upon the

4   information known to Defendant Crain, he considered Mr. Woodral to be dangerous, to have a

5   propensity for violence, and to be able-bodied enough to run and/or reach for a weapon if

6   released, despite the bite to his arm.  *(Id.)*  While Defendant Crain maintained control of K9 Colt

7   by his collar, Defendant Crain believed it was neither safe nor practical for K9 Colt to release Mr.

8   Woodral before a backup deputy was nearby and available to secure Mr. Woodral in handcuffs.

9   (DSSUF ¶ 26.)

10       Defendant Crain then looked to see that Deputy Prasad was approaching his location in

11  the orchard on foot.  (DSSUF ¶ 27.)  Defendant Crain maintained control of K9 Colt by his collar

12  for up to 15 seconds until Defendant Crain determined it was safe to command K9 Colt to release

13  the bite.  *(Id.)*  K9 Colt released Mr. Woodral at Defendant Crain's command, once Deputy

14  Prasad was in close proximity.  *(Id.)*  Deputy Prasad put on rubber gloves per Defendant Crain's

15  instructions, then placed Mr. Woodral in handcuffs.  (Doc. 31-5, Crain Decl. ¶ 23; DSSUF ¶ 27)

16  Mr. Woodral was searched and did not have any weapons on his person.  (Doc. 31-5, Crain Decl.

17  ¶ 23.)  K9 Colt apprehended Mr. Woodral for approximately 30-32 seconds in total.  (DSSUF ¶

18  28.)

19       Defendant Crain did not see or believe that K9 Colt bit Mr. Woodral's torso during this

20  apprehension.  (DSSUF ¶ 29.)  Defendant Crain has not seen evidence of a dog bite on Mr.

21  Woodral's abdomen. *(Id*.)  From Defendant Crain's witnessing of the apprehension, the bite was

22  limited to Mr. Woodral's right arm and hand area and K9 Colt did not bite "off" Mr. Woodral's

23  thumb.  *Id.*

24       After Mr. Woodral was in handcuffs, Defendant Crain placed K9 Colt on lead and ran

25  through the orchard to locate the second subject, Dennis Herd, who had also fled from the truck

26  and into the orchard. (DSSUF ¶ 30.)  Herd was safely taken into custody without the need of

27  physical apprehension by K9 Colt.  *(Id.)*  After Herd was in custody, Defendant Crain drove back

28  to Deputy Prasad and Mr. Woodral to get an update.  (DSSUF ¶ 31.)  Defendant Crain saw that

1  paramedics with Oak Valley ambulance were treating Mr. Woodral.  (*Id.*)  The ambulance

2  transported Mr. Woodral from the scene of the incident to Doctors Medical Center in Modesto for

3  treatment of his injuries.  (*Id.*)

4       Several items were recovered and booked into evidence, including a flare gun, flares and

5  narcotics.  (DSSUF ¶ 33.)  A knife and boxcutters were recovered from subject Herd's backpack

6  at the scene.  (*Id.*)  After Detective Briggs gave Mr. Woodral his Miranda rights, Defendant Crain

7  spoke with Mr. Woodral at the hospital.  (DSSUF ¶ 32.)  Defendant Crain asked Mr. Woodral

8  about the use of K9 Colt.  (*Id.*)  Mr. Woodral stated to Defendant Crain: "You did your job and I

9  should have not ran."  (*Id.*)  Defendant Crain asked Mr. Woodral if he heard the K9 warning.

10  (*Id.*)  Mr. Woodral replied "yeah, I heard you. I was trying to get away."  (*Id.*)

11       Mr. Woodral's injuries included an open fracture with an open wound on the right thumb

12  proximal phalanx and a closed fracture of the middle phalanx of Mr. Woodral's ring finger.

13  (DSSUF ¶ 40.)  According to Mr. Woodral's surgeon, Dr. Frazier, Mr. Woodral's thumb was not

14  bitten off – the bite instead "caused an open wound on his thumb… and fractured it."  (DSSUF ¶

15  41.)  After surgery, Dr. Frazier expected Mr. Woodral to have good function of his right hand and

16  to be able to perform activities of daily living.  (DSSUF ¶ 43; UF ¶ 16.)  Dr. Frazier ordered

17  postoperative care including IV antibiotic treatment.  (*Id.*)  Mr. Woodral left the hospital on

18  February 4, 2019, against medical advice, without completing his treatment or wearing his splint

19  to protect the bone repair.  (DSSUF ¶¶ 43-44.)  Mr. Woodral returned to the hospital on February

20  19, 2019, after his right thumb was infected.  (DSSUF ¶ 45.)  According to Dr. Frazier, Mr.

21  Woodral's prognosis was adversely affected by his noncompliance with the postoperative care

22  plan.  (*Id.*)

23       On August 11, 2020, in the County of Merced Superior Court, Mr. Woodral entered a plea

24  of no contest to carjacking from [December] 14th, 2018, pursuant to California Penal Code

25  Section 215, Subdivision (a).  (DSSUF ¶ 50.)  Carjacking is a "violent felony" under California

26  Penal Code 667.5, Subdivision (c), Subdivision (17).  (*Id.*)  Mr. Woodral further entered a plea of

27  no contest to grand theft on the same date, pursuant to California Penal Code Section 487,

28  Subdivision (a).  (*Id.*)

1    The use of K9 Colt to apprehend Mr. Woodral was reviewed and approved by the

2    Stanislaus County Sheriff's Department K9 unit Sergeant LaBarbera.  (DSSUF ¶ 34.)  Defendant

3    Crain received no adverse actions from the Stanislaus County Sheriff's Department for the use of

4    K9 Colt in apprehending Mr. Woodral.  *(Id.)*  Defendant Crain believes that his use of K9 Colt to

5    apprehend Mr. Woodral fell clearly within the guidelines of the County policy and was necessary

6    given the circumstances.  (DSSUF ¶¶ 35-36.)  Deputy Crain believes he removed K9 Colt from

7    the bite as soon as reasonably practical given the circumstances.  (DSSUF ¶¶ 37-39.)

8    Defendants' expert on K9 policies determined that the policies, practices and training of the

9    Stanislaus County Sheriff's Department Canine Program meet national law enforcement

10   standards and that the proper canine deployment procedures and policies were adhered to in

11   apprehending Mr. Woodral.  (DSSUF ¶¶ 46-48.)

12   **III.    LEGAL STANDARD**

13   Summary judgment is appropriate when the pleadings, disclosure materials, discovery,

14   and any affidavits provided establish that "there is no genuine dispute as to any material fact and

15   the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A material fact is

16   one that may affect the outcome of the case under the applicable law. *See Anderson v. Liberty*

17   *Lobby, Inc*., 477 U.S. 242, 248 (1986).  A dispute is genuine "if the evidence is such that a

18   reasonable [trier of fact] could return a verdict for the nonmoving party." *Id.*  Summary judgment

19   must be entered, "after adequate time for discovery and upon motion, against a party who fails to

20   make a showing sufficient to establish the existence of an element essential to that party's case,

21   and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S.

22   317, 322 (1986).

23   The party seeking summary judgment "always bears the initial responsibility of informing

24   the district court of the basis for its motion, and identifying those portions of the pleadings,

25   depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

26   which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex*, 477 U.S.

27   3 at 323.  The exact nature of this responsibility, however, varies depending on whether the issue

28   on which summary judgment is sought is one in which the movant or the nonmoving party carries

the ultimate burden of proof.  *See Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).  If the movant will have the burden of proof at trial, it must "affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party."  *Id.*  (citing *Celotex*, 477 U.S. at 323).  In contrast, if the nonmoving party will have the burden of proof at trial, "the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case."  *Id.*

If the movant satisfies its initial burden, the nonmoving party must go beyond the allegations in its pleadings to "show a genuine issue of material fact by presenting affirmative evidence from which a jury could find in [its] favor."  *FTC v. Stefanchik*, 559 F.3d 924, 929 (9th Cir. 2009) (emphasis in original).  "[B]ald assertions or a mere scintilla of evidence" will not suffice in this regard.  *Id.* at 929; *see also Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) ("When the moving party has carried its burden under Rule 56[], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.") (citation omitted).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita,* 475 U.S. at 587 (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).  Where, as here, the parties cross-move for summary judgment on a claim, the court is required to review the evidence submitted by the parties in support of their own motions and in opposition to the opposing party's motion in deciding each summary judgment motion.  *Fair Hous. Council of Riverside Cty., Inc., v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (finding district court was required to review the evidence properly submitted in support of plaintiffs' motion for summary judgment to determine whether it presented a disputed issue of material fact precluding summary judgment on defendants' motion for summary judgment); *Poway Unified Sch. Dist.*, 658 F.3d 954, 960 (9th Cir. 2011) (stating court considers each party's evidence on cross motions to evaluate whether summary judgment was appropriate).

In resolving a summary judgment motion, "the court does not make credibility determinations or weigh conflicting evidence."  *Soremekun,* 509 F.3d at 984.  Instead, "[t]he evidence of the [nonmoving party] is to be believed, and all justifiable inferences are to be drawn

1    in [its] favor." *Anderson,* 477 U.S. at 255.  Inferences, however, are not drawn out of the air; the

2    nonmoving party must produce a factual predicate from which the inference may reasonably be

3    drawn.  *See Richards v. Nielsen Freight Lines*, 602 F.Supp. 1224, 1244-45 (E.D. Cal. 1985),

4    aff'd, 810 F.2d 898 (9th Cir. 1987).

5        **IV.      DISCUSSION**

6            Plaintiffs' First Amended Complaint alleges: a Section 1983 excessive force claim against

7    Defendant Crain predicated on a violation of Mr. Woodral's rights under the Fourth Amendment;

8    Section 1983 *Monell* liability against Defendant Stanislaus County; a Bane Act claim against

9    Defendant Crain under California Civil Code § 52.1; Battery against all Defendants under

10   California Penal Code § 242; and Negligence against all Defendants under California common

11   law.  (Doc. 18.)  Defendants have challenged each of these claims in their motion for summary

12   judgment, or in the alternative, partial summary judgment.  (Doc. 31-1.)  Plaintiffs have in turn

13   sought summary adjudication against Defendants as to the liability portion of their excessive

14   force, negligence and *Monell* claims.  (Doc. 32.)

15       **A.  Section 1983 Excessive Force Claim Against Defendant Crain**

16           Plaintiffs plead a Section 1983 excessive force claim against Defendant Crain arising from

17   the injuries K9 Colt inflicted on Mr. Woodral.  (Doc. 18; UF ¶ 10.)  Specifically, Plaintiffs argue

18   that excessive force was used when Defendant Crain did not order K9 Colt to release the bite after

19   Mr. Woodral was subdued by K9 Colt and had complied with Defendant Crain's instructions.[4]

20   (PSSUF ¶¶ 11-19.)  Defendants seek summary judgment on Plaintiffs' excessive force claim,

21   arguing that the force used was objectively reasonable and that Defendant Crain is entitled to

22   qualified immunity.  (Doc. 31-2.) Plaintiffs seek summary adjudication as to the liability portion

23   of their excessive force claims.  (Doc. 32.)

24           ///

25   _____

     [4] The Court construes Plaintiffs' excessive force challenge as relating to the "continued biting" of
26   Mr. Woodral, as discussed *infra*.  Based on Plaintiffs' evidence and briefing, the excessive force
     claim is not regarding the initial deployment of the dog or the bite until Defendant Crain reached
27   Mr. Woodral and the dog, but instead the excessive force claim arises from the prolonged bite
     between when Defendant Crain reached Mr. Woodral and when Defendant Crain ordered the dog
28   to release the bite.

1          **1.  Reasonable Force Analysis**

2          The Fourth Amendment permits law enforcement to use objectively reasonable force.

3  *Graham v. Connor*, 490 U.S. 386, 396–97 (1989). Such an inquiry requires the Court to "consider

4  the totality of the circumstances." *Gonzalez v. City of Anaheim*, 747 F.3d 789, 794 (9th Cir. 2014)

5  (en banc) (citation omitted).

6          The Ninth Circuit has noted that, in "assessing the objective reasonableness of a particular

7  use of force, we consider: (1) 'the severity of the intrusion on the individual's Fourth Amendment

8  rights by evaluating the type and amount of force inflicted,' (2) 'the government's interest in the

9  use of force,' and (3) the balance between 'the gravity of the intrusion on the individual' and 'the

10  government's need for that intrusion.'" *Lowry v. City of San Diego*, 858 F.3d 1248, 1256 (9th

11  Cir. 2017) (quoting *Glenn v. Washington County*, 673 F.3d 864, 871 (9th Cir. 2011)).

12          The Ninth Circuit emphasized that the "factors bearing on the reasonableness of a

13  particular application of force, are not to be considered in a vacuum but only in relation to the

14  amount of force used to effect a particular seizure." *Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir.

15  1994).  Further, the Ninth Circuit has cautioned that, "[b]ecause such balancing nearly always

16  requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, we

17  have held on many occasions that summary judgment or judgment as a matter of law in excessive

18  force cases should be granted sparingly." *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002).

19          The Ninth Circuit has held that use of a police dog may constitute excessive force

20  depending on the factual circumstances.  *Lowry*, 858 F.3d at 1256; *see Smith v. City of Hemet*,

21  394 F.3d 689, 702 (9th Cir. 2005), disapproved of on other grounds by *Lemos v. Cnty. of Sonoma*,

22  40 F.4th 1002 (9th Cir. 2022); *Chew*, 27 F.3d at 1441 ("the district court's decision to take the

23  [use of a K9] excessive force question away from the jury conflicts with circuit law."); *Miller*,

24  340 F.3d at 963–68 ("Even if [the dog] avoids a suspect's head and neck, and bites a suspect's arm

25  or leg, as the dog is trained to do, his bite may pose some modest threat to a suspect's life.");

26  *Hernandez v. Town of Gilbert*, 989 F.3d 739, 744 (9th Cir. 2021) ("We held that the law was

27  clearly established that the use of the police dog was subject to excessive force analysis.")

28          Defendants primarily argue that only reasonable force was used in the deployment of K9

12

1  Colt to arrest Mr. Woodral as shown by the balance of factors.  (Doc. 31-1 at 15-22.)  Plaintiffs

2  instead argue the balance of factors weighs in favor of finding excessive force was used against

3  Mr. Woodral. (Doc. 32 at 10-14, Doc. 38 at 12-13.)

4              **a.  Severity of Intrusion**

5          Defendants first claim that there was only a moderate intrusion during Mr. Woodral's

6  apprehension by K9 Colt, while Plaintiffs argue that the intrusion was severe.  (Doc. 31-1 at 15-

7  18; Doc. 32 at 10-11.)  The Ninth Circuit has emphasized that "characterizing the quantum of

8  force with regard to the use of a police dog depends on the specific factual circumstances."

9  *Lowry*, 858 F.3d at 1256.  In examining the quantum of force used, the "nature and degree of

10  physical contact are relevant to this analysis… as are the 'risk of harm and the actual harm

11  experienced.'"  *Williamson v. City of Nat'l City*, 23 F.4th 1146, 1152 (9th Cir. 2022) (quoting

12  *Forrester v. City of San Diego*, 25 F.3d 804, 807 (9th Cir. 1994) and *Nelson v. City of Davis*, 685

13  F.3d 867, 879 (9th Cir. 2012).)

14          The Ninth Circuit has held that the use of the bite-and-hold technique by a police canine

15  constitutes a significant degree of force.  *See Miller*, 340 F.3d at 964.  The duration of the dog

16  bite is a factor in considering whether the force used was reasonable or excessive.  *Id.* (upholding

17  District Court determination that the force used was "considerable" and "exacerbated by the [45-

18  60 second] duration of the bite" when a deputy allowed a police dog to bite and hold the plaintiff

19  for an "unusually long time period"); *Watkins v. City of Oakland*, 145 F.3d 1087, 1093 (9th Cir.

20  1998) (holding the "excessive duration" of a bite "could constitute excessive force that would be

21  a constitutional violation" where the police dog bit the plaintiff for approximately ten to fifteen

22  seconds); *Lowry*, 858 F.3d at 1253, 1257 (the use of force was not severe, but emphasized that the

23  encounter between the plaintiff and police dog was "so brief that [the officer] did not even know

24  if contact had occurred.").

25          The Ninth Circuit has also considered the level of injury in determining the degree of

26  force used.  *See Chew*, 27 F.3d at 1441 (finding force used was severe when a police dog bit the

27  plaintiff three times before achieving an effective hold, dragged the plaintiff between four and ten

28  feet, caused severe lacerations, and "nearly severed" the plaintiff's arm); *Miller*, 340 F.2d at 964

1  (finding intrusion was serious where the plaintiff's skin was torn in four places, the plaintiff's

2  muscles were shredded, and the injury went as deep as the bone).

3      On the duration of the bite, a reasonable jury could find the length of K9 Colt's continued

4  bite, after Mr. Woodral was subdued by K9 Colt and had complied with Defendant Crain's

5  instructions, to be excessive.  The parties appear to agree on some of the basic circumstances

6  surrounding the bite: Mr. Woodral had complied with Defendant Crain's instructions, moved onto

7  his stomach, and yelled for Defendant Crain to get the dog off of him while K9 Colt continued to

8  bite Mr. Woodral.  (UF ¶ 11, PSSUF ¶¶14-17, DSSUF ¶¶ 22-23.)  Once Mr. Woodral complied

9  and said he was not going to run, Defendant Crain held the dog for a time while the dog

10  continued to bite Mr. Woodral.  (PSSUF ¶ 18, DSSUF ¶ 26.)  K9 Colt continued to bite Mr.

11  Woodral for approximately 15-18 seconds. (PSSUF ¶ 18; DSSUF ¶ 27.)  Once ordered to release

12  his bite, K9 Colt released Mr. Woodral.  (UF ¶ 13.)

13      A dispute of material fact remains regarding how long K9 Colt continued to bite Mr.

14  Woodral's arm between when Defendant Crain arrived at the apprehension location, with Mr.

15  Woodral on the ground and complying, and when the second deputy arrived.  Defendants contend

16  that after Defendant Crain arrived at the apprehension location, Defendant Crain "maintained

17  control of Colt by his collar for up to 15 seconds until [Defendant] Crain determined it was safe

18  to command Colt to release the bite… once Deputy Prasad was in close proximity."  (DSSUF ¶

19  27.)  Plaintiffs contend that "Defendant Crain straddled the K9 unit and picked it up by its vest

20  while it continued biting [Mr. Woodral]'s arm; the deputy held the dog like this for approximately

21  18 seconds before the it [sic] released its bite."  (PSSUF ¶ 18.)  Thus, the parties dispute the

22  duration of this continued bite.

23      Depending on the duration of the continued bite, a reasonably jury could conclude that the

24  duration of time, between when Defendant Crain arrived at the apprehension location and K9

25  Colt's release of the bite once Deputy Prasad arrived, was excessive.

26      This duration of force may be comparable to the officers permitting the ten to fifteen

27  second bite in *Watkins*.  *Watkins*, 145 F.3d at 1090. In *Watkins,* the court agreed with the plaintiff

28  there that the duration and extent of force applied in effecting arrest after the officers catches up

14

1    with a fleeing subject may amount to an unconstitutional application of force.  And the duration

2    of K9 Colt's continued bite here likely exceeds that of the dog bite in *Lowry* that was "so brief

3    that [the officer] did not even know if contact had occurred." *Lowry*, 858 F.3d at 1253, 1257.

4    Although the continued bite here is not as lengthy as the "unusually long time period" of 45 to 60

5    seconds in *Miller*, the Ninth Circuit there noted that "[o]rdinarily, the dog bites a suspect for only

6    about four seconds before [the officer] orders the dog to release."  *Miller*, 340 F.3d at 961.

7    Furthermore, the police dog in *Miller* was called off as soon as the deputy could see the dog had

8    caught the plaintiff and that the plaintiff was unarmed.  *Id.*  Here, Defendant Crain arrived at Mr.

9    Woodral's location in the orchard, then kept the dog on Mr. Woodral for some duration of time

10   until Deputy Prasad joined them.  (DSSUF ¶¶ 27, 39.)

11          In addition to the length of the bite, Defendants offer no rationale why Defendant Crain

12   was incapable of placing handcuffs on Mr. Woodral once Defendant Crain arrived at the

13   apprehension location.  There is no explanation why Defendant Crain had to wait for Deputy

14   Prasad to put handcuffs on Mr. Woodral rather than Defendant Crain handcuffing Mr. Woodral

15   himself.  These factual circumstances might lead a reasonable jury to conclude that Defendant

16   Crain waiting for Deputy Prasad prolonged the force more than reasonably necessary.  A

17   reasonable jury could therefore find the duration of K9 Colt's continued bite weighs in favor of

18   finding a severe intrusion.

19          On the issue of injury, Mr. Woodral sustained injuries that required surgery, and those

20   injuries have had long-term effects.  Plaintiffs note that Mr. Woodral's "thumb was left with

21   ligaments hanging out of it after the dog attack."  (PSSUF ¶ 29.)  After his arrest, Mr. Woodral

22   was treated by paramedics and admitted to the hospital, where surgery was performed on his right

23   thumb and ring finger.  (UF ¶ 17.)  Following treatment, Mr. Woodral did not have feeling in his

24   thumb and could not bend it.  (PSSUF ¶ 29.)  Mr. Woodral also struggled to write his name and

25   could not make a fist or pick up more than four pounds with his right hand.  (PSSUF ¶ 30.)

26          Defendants note that Mr. Woodral had similar injuries but contest the severity of those

27   injuries.  Defendants state that Mr. Woodral sustained moderate injuries that included an open

28   fracture with an open wound on the right thumb proximal phalanx and a closed fracture of the

ring finger middle phalanx. (DSSUF ¶ 40.) The tendons, nerve, and arteries of the thumb "were all intact" according to Mr. Woodral's surgeon, who expected Mr. Woodral to have good functioning of his right hand.  (DSSUF ¶¶ 42-43.)  Defendants further suggest that Mr. Woodral's injuries were exacerbated by Mr. Woodral's noncompliance with the postoperative care plan. (DSSUF ¶¶ 43-45.)

Given the disputed severity, nature, and long-term impact of Mr. Woodral's injuries, a reasonable jury could find that his injuries were akin to those in cases where the Ninth Circuit found severe intrusion.  *See Miller*, 340 F.2d at 961 (the plaintiff "underwent surgery by an orthopedic surgeon and spent several days in the hospital" [and] "continues to suffer lingering effects from the dog bite."); *Chew*, 27 F.3d at 1441 (the plaintiff asserted that his arm was "nearly severed" and the officer "acknowledged that the injuries to [the plaintiff's] side and arm were 'pretty severe' and that '[t]here was some serious lacerations.'"); *Watkins*, 145 F.3d at 1090 (officers called an ambulance and the examining paramedic noted "multiple lacerations and punctures to [the plaintiff's] left foot" and "a jagged tearing of the skin and a puncture deep enough to allow him to see [the plaintiff's] tendons.")  Like the plaintiffs in those cases, Mr. Woodral required surgery and had open wounds.  (UF ¶ 17, DSSUF ¶ 40.)  In addition, Plaintiffs contend that Mr. Woodral suffered lingering effects that affected his use of his thumb and hand. (PSSUF ¶ 29-30.)  This could lead a reasonable jury to conclude that Mr. Woodral's injuries were severe.

Alternately, a reasonable jury could find that Mr. Woodral's injuries and intrusions were more moderate.  Following Defendants' evidence that the tendons, nerve, and arteries of Mr. Woodral's thumb were all intact, a reasonable juror could view the injuries as more similar to those of the plaintiff in *Lowry,* who had a minor bite to the lip and only required three stitches. *Lowry*, 858 F.3d at 1254; (DSSUF ¶¶ 42.)  Given the material disputes regarding the severity of Mr. Woodral's injuries and the duration of K9 Colt's continued bite, a reasonable jury could find that there was a severe intrusion.

In their motion, Defendants argue that the force and intrusion here was comparable to cases where the Ninth Circuit found that objectively reasonable force was used, such as *Miller v.*

1   *Clark County* and *Hernandez v. Town of Gilbert*.  (Doc. 31-1 at 16.)  However, this comparison is

2   inapposite.  In *Miller*, the Ninth Circuit concluded that there had actually been a "serious"

3   intrusion given the "unusually long" bite of 45 to 60 seconds.  *Miller*, 340 F.3d at 960-61, 964.

4   This conclusion was bolstered by the potential injury from a prolonged bite even before an officer

5   had reached the plaintiff.  *Id.*  In the instant case, however, K9 Colt continued to bite Mr.

6   Woodral for some length of time after Defendant Crain reached a compliant Mr. Woodral.

7   (PSSUF ¶¶ 14-19; DSSUF ¶ 27.)

8          In *Hernandez*, the Ninth Circuit noted, "[o]ur caselaw is clear that an officer cannot direct

9   a police dog to continue biting a suspect who has fully surrendered and is under the officer's

10  control" but found that the officer was entitled to qualified immunity because the plaintiff "did

11  not surrender at any point during the encounter; rather, the officers had to physically drag him

12  from his car after the dog bite."  *Id.* at 745-46.  The Ninth Circuit made clear that the plaintiff had

13  not surrendered even after the police dog bit the plaintiff's arm for approximately 50 seconds.  *Id.*

14  at 743.  Officers ultimately had to pull the plaintiff from the car when he still refused to surrender,

15  approximately twenty seconds after the police dog had stopped biting him.  *Id.*

16         Unlike the plaintiff in *Hernandez* who had not surrendered, Mr. Woodral lay on the

17  ground and was complying with officer instructions while K9 Colt continued to bite him.

18  (PSSUF ¶¶ 14-19; DSSUF ¶ 27.)  Defendants' attempt to compare the duration or quantum of

19  force in pre-compliance bites to a post-compliance bite does not support a finding of moderate

20  intrusion here.  A reasonable jury could still find that the intrusion was severe.  A reasonable jury

21  could therefore similarly conclude that the duration and injury caused a serious intrusion on Mr.

22  Woodral's Fourth Amendment rights.

23                            **b.  Government Interest**

24         Courts assess the strength of the government's interest in the use of force by evaluating:

25  "(1) the severity of the crime at issue[;] (2) whether the suspect posed an immediate threat to the

26  safety of the officers or others[;] and (3) whether the suspect was actively resisting arrest or

27  attempting to evade arrest by flight." *Miller*, 340 F.3d at 964 (citing *Graham*, 490 U.S. at 396).

28  "Other relevant factors [to the strength of the government's interest] include the availability of

less intrusive alternatives to the force employed, whether proper warnings were given and whether it should have been apparent to officers that the person they used force against was emotionally disturbed." *Glenn*, 673 F.3d at 872.  However, "[w]hen evaluating the government's interest, the most important factor is whether the person posed an immediate threat to the safety of the officer or another." *Tan Lam v. City of Los Banos*, 976 F.3d 986, 998 (9th Cir. 2020).

### i.   Severity of the Crime at Issue

Defendants contend that Mr. Woodral's crimes were severe.  (Doc. 31-1 at 18.) They emphasize that Mr. Woodral was on Post Release Community Supervision and was out on bail for an investigation in other theft cases.  (UF ¶¶ 1-2.)  At the time, Mr. Woodral was also a suspect in an investigation of a stolen fuel trailer.  (UF ¶ 2.)  Defendants further point to, and Plaintiffs do not dispute, evidence that Mr. Woodral was booked on felony charges including vehicle theft, receiving a known stolen vehicle, conspiracy, and a violation of Post Release Community Supervision.  (DSSUF ¶¶ 49-50, Doc. 38-1, Plaintiffs' Response to Defendants' Separate Statement of Material Facts, ¶¶ 49-50.)  Plaintiffs also do not dispute that Mr. Woodral entered a plea of no contest to carjacking, which is classified as a "violent felony" under California Penal Code 667.5(c)(17).  (DSSUF ¶ 50; Doc. 38-1 ¶ 50.)  Plaintiffs instead argue that the crime was not severe, as Mr. Woodral's suspected possession of a stolen fuel trailer was a nonviolent offense and Mr. Woodral was unarmed.  (UF ¶¶ 3-4; Doc. 31-5, Crain Decl. ¶ 23.)

The Ninth Circuit has addressed suspicion of felonies in the context of severity of crimes factor.  In *Chew*, where the plaintiff had three outstanding felony warrants for his arrest, the Ninth Circuit emphasized that "the record does not reveal the type of felony for which [plaintiff] Chew was wanted" and found that the "existence of three warrants for undetermined crimes—for which Chew had not been tried or convicted—is thus not strong justification for the use of dangerous force." *Chew*, 27 F.3d at 1442 (citing *Tennessee v. Garner*, 471 U.S. 1, 14 (1985) ("the assumption that a "felon" is more dangerous than a misdemeanant [is] untenable.")).  Examining the totality of the circumstances, the Ninth Circuit noted that the "significance of the warrants is further diminished by the facts that Chew was completely surrounded by the police, and that the prospects for his imminent capture were far greater than are those of the many fleeing suspects

18

1    who are fleeter than the police officers chasing them." *Id.* at 1443.

2          The Ninth Circuit further developed its approach to the severity of the crime factor in

3    *Miller*, where the plaintiff was wanted for both a misdemeanor traffic infraction and a felony of

4    attempting to flee from police by driving a car with a wanton or willful disregard for the lives of

5    others. *Miller*, 340 F.3d at 960, 964.  There, the Ninth Circuit noted that the government's

6    interest is "even stronger when the criminal is…suspected of a felony, which is by definition a

7    crime deemed serious by the state" and concluded that this factor "strongly favors the

8    government." *Id.*  In a footnote, the Ninth Circuit further explained: "Even if [the plaintiff] was

9    wanted only for a nondangerous felony, we still would deem it significant—though of limited

10   significance—that [the plaintiff] was a felony suspect." *Id.* at 965, n.10 (citing *Chew*, 27 F.3d

11   1442-4); *see also United States v. Hensley*, 469 U.S. 221, 229 (noting the "strong government

12   interest in solving crimes and bringing offenders to justice" in a case involving *Terry* stops).

13         The Court finds that this factor weighs in favor of governmental interest in the intrusion.

14   Mr. Woodral was a suspect in an investigation of a stolen fuel trailer.  (UF ¶ 2.)  As in *Miller*, Mr.

15   Woodral was fleeing and being pursued in relation to vehicle theft and charged with felonies

16   including vehicle theft, receiving a known stolen vehicle, conspiracy, and a violation of Post

17   Release Community Supervision.  (DSSUF ¶ 49, Doc. 38-1, ¶ 49.)  Unlike in *Chew*, where the

18   nature of the plaintiff's felonies were unclear, the record here shows that Mr. Woodral was

19   booked on and entered a plea of no contest for vehicle theft, which California categorizes as a

20   violent felony.  (DSSUF ¶¶ 49-50, Doc. 38-1, ¶¶ 49-50.)  Following the Ninth Circuit's guidance

21   in assigning greater significance to violent felonies, the severity of the crime factor thus weighs in

22   favor of a finding that the government had an interest in using force.

23                    ii.    **Immediate Threat to Safety of Officer or Another**

24         The Ninth Circuit has deemed the immediate threat to safety of an officer or another the

25   "most important" factor. *Tan Lam*, 976 F.3d at 998.  In cases where suspects are lying on the

26   ground or complying with officer instructions, courts have found that reasonable juries could

27   conclude that plaintiffs did not pose a threat to officers or others.  In *Smith v. City of Hemet,*

28   where a police dog was used, the plaintiff initially refused to comply with officer instructions to

                                          19

remove his hands from his pajama pockets, then complied before force was used.  *Smith*, 394

F.3d at 702, disapproved of on other grounds by *Lemos v. Cnty. of Sonoma*, 40 F.4th 1002 (9th

Cir. 2022).  In that case, where the plaintiff "continued to shield one arm from the officers and

their dog and plaintiff shouted expletives at the officers" until both of his arms were handcuffed,

the Ninth Circuit found that the record showed the officers had no reason to believe that the

plaintiff "possessed any weapon or posed any immediate threat to the safety of the officers or

others."  *Id.*  The Ninth Circuit concluded that a rational jury could find that the plaintiff "did not,

at any time, pose a danger to the officers or others."  *Id.*

In a more recent case involving a police dog, a District Court examined whether the

plaintiff posed a threat where he "was on his stomach with his arms outstretched as the [police

dog] continued to bite him for at least twenty seconds."  *Rosenbaum v. Dunn*, No. 20-CV-04777-

NC, 2022 WL 17491969, at *6 (N.D. Cal. Nov. 28, 2022).  The plaintiff there did not issue "any

specific threats to the officers or actively resist[] the officers once the [police dog] was engaged."

Prior to releasing the dog, the officers were made aware by a victim of the plaintiff's recent

domestic assault, intoxication status, martial arts training, potential firearm ownership, and

previous altercations with the police.  *Id.* at *1.  The court there found that, "[a]lthough the

circumstances preceding the bite led [the officer] to believe [the plaintiff] could pose an imminent

deadly threat, considering the evidence in the light most favorable to Plaintiff, a rational jury

could very well find that he did not pose a danger to the officers during the duration of the bite."

*Id.* at *6; *see also Lawrence v. Las Vegas Metro. Police Dep't*, 451 F. Supp. 3d 1154, 1171 (D.

Nev. 2020) (where the plaintiff was "lying on the ground, severely bleeding and not moving, a

reasonable juror could certainly conclude that [the plaintiff] did not pose an immediate threat to

the officers or to other people. Accordingly, the government's interest in the use of force would

ebb to its lowest point, and the use of the K-9 could constitute excessive force."); *Drummond ex*

*rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1057 (9th Cir. 2003) (noting that while the

individual may have represented a threat before he was handcuffed, a reasonable jury could find

he posed a minimal threat after he was knocked to the ground and handcuffed).

In other cases involving a K9 unit, the Ninth Circuit has found that the plaintiff posed a

1    threat.  In *Miller*, the Ninth Circuit noted that the plaintiff being pursued "possessed a large knife

2    moments earlier" and the officer involved knew "there was a chance [the plaintiff] was not 'law

3    enforcement friendly'… [and] had mental health problems" based upon information from other

4    officers.  *Miller*, 340 F.3d at 965.  The court also emphasized that the plaintiff was familiar with

5    the area and, "[p]erhaps more importantly, [the officer] knew that if [the plaintiff]'s defiant and

6    evasive tendencies turned violent, and [plaintiff] staged an ambush, [the plaintiff] would possess a

7    strategic advantage over the deputies."  *Id.*  Given these circumstances, the Ninth Circuit found

8    that the "[s]econd… factor weighs heavily in the government's favor."  *Id.*  The Ninth Circuit

9    followed the reasoning of *Miller* in *Lowry,* where officers were investigating a burglary in a dark

10   commercial building where the plaintiff appeared to be hiding.  *Lowry*, 858 F.3d at 1258.  There,

11   the Ninth Circuit noted that, "when confronted with signs of a burglary, investigating officers are

12   entitled to protect their own safety" and found that the immediate threat factor weighed in favor

13   of the defendants.  *Id.* (citing *Sandoval*, 756 F.3d at 1163.)

14        Defendants argue here that Mr. Woodral posed a threat to officers' safety, as Defendant

15   Crain did not know if Mr. Woodral was armed and Mr. Woodral's criminal history included

16   arrests for thefts, drugs, and domestic violence.  (UF ¶¶ 1-4; DSSUF ¶¶ 4-5, 24-25.)  Plaintiffs in

17   turn suggest that Mr. Woodral offered little threat as: Mr. Woodral complied with Defendant

18   Crain's instructions and lay on the ground where he could not move, Defendant Crain lacked

19   information that Mr. Woodral was armed, Defendant Crain lacked information that Mr.

20   Woodral's criminal history involved any assaults on law enforcement or firearms offenses, Mr.

21   Woodral did not have weapons on his person when he was searched, and the arrest took place in a

22   remote orchard without nearby members of the public. (UF ¶¶ 1-4; PSSUF ¶¶ 3, 6-7, 12-19;

23   DSSUF ¶ 27; Doc. 31-5, Crain Decl. ¶ 23.)

24        Considering both parties' diverging views of the evidence for this "most important"

25   factor, a reasonable jury could find that Mr. Woodral did not pose a threat.  Mr. Woodral initially

26   fled from officers, but at the time of the prolonged dog bite, he already lay on the ground and had

27   complied with Defendant Crain's instructions to get on his stomach.  (UF ¶¶ 6-9, 12.)  Once on

28   the ground, Mr. Woodral does not appear to have issued any verbal threats to the officers –

21

1  instead, the evidence suggests that Mr. Woodral yelled out to Defendant Crain, "get this dog off

2  of me" and may have told Defendant Crain that he was not trying to run anymore.  (DSSUF ¶ 22,

3  PSSUF ¶ 16.)  Following Defendant Crain's arrival, K9 Colt continued biting Mr. Woodral while

4  Defendant Crain held K9 Colt.  (PSSUF ¶¶ 14-19; DSSUF ¶ 27.)

5         Considering the evidence in light most favorable to the Plaintiffs, a reasonable jury may

6  conclude that Mr. Woodral did not pose an immediate threat to officers or others.  Mr. Woodral

7  lay on the ground and complied with officer instructions, appearing to have offered less of a

8  threat than the plaintiff in *Smith*, where the Ninth Circuit found that the plaintiff did not pose "any

9  immediate threat to the safety of the officers or others" despite shouting expletives and shielding

10  his arms while the officers attempted to handcuff him.  *Smith*, 394 F.3d at 702.  Like *Rosenbaum*,

11  Mr. Woodral offered no further resistance or verbal threats once he was on the ground, only

12  requesting Defendant Crain get the dog off of him.  *Rosenbaum* 2022 WL 17491969, at *1, 6.

13  Accordingly, a reasonable jury here could conclude that Mr. Woodral did not pose a threat to

14  officers or others.

15              **iii.        Resistance or Evasion of Arrest**

16         On the resistance of arrest factor, Defendants argue that Mr. Woodral was actively

17  resisting arrest as he drove away from pursuing police vehicles, ran from Defendant Crain,

18  continued running after Defendant Crain made a K9 announcement, and never declared he was

19  unarmed despite his physical compliance of lying on his stomach.  (DSSUF ¶¶ 14-16, 18-22, 24.)

20  Plaintiffs instead argue that when the alleged excessive force was used, Mr. Woodral had already

21  stopped running, lay on the ground, and complied with Defendant Crain's commands while K9

22  Colt continued biting him.  (PSSUF ¶¶ 14-19, 25.)

23         In light of both parties evidence, it cannot be disputed that Mr. Woodral initially resisted

24  arrest and fled from pursuing officers.  (UF ¶ 6.)  It is also undisputed that once caught, Mr.

25  Woodral complied with Defendant Crain's instructions to get on his stomach.  (UF ¶ 12.)  As

26  discussed, some amount of time passed between when Mr. Woodral's active resistance ended and

27  when K9 Colt released the bite.  (PSSUF ¶¶ 14-19, DDUF ¶ 27.)  While the Court is mindful not

28  to judge with the 20/20 vision of hindsight, the amount of time that elapsed between Mr. Woodral

1    actively resisting and the bite ending is a material consideration.  See *Bryan v. MacPherson*, 630

2    F.3d 805, 826 (9th Cir. 2010) (noting the totality of the circumstances is to be examined).

3    Accordingly, there is a genuine dispute regarding this active resistance or evasion factor.

4         On this issue, Defendants argue that Mr. Woodral's actions were similar to the *Hernandez*

5    plaintiff's noncompliance with officers.  (Doc. 31-1 at 20-21.)  There, officers told the plaintiff to

6    exit a vehicle, and in response the plaintiff yelled "alright" but did not exit the car or put his arms

7    up.  *Hernandez*, 989 F.3d at 747.  Instead, the plaintiff continued to resist being removed from the

8    car even after the police dog bit the plaintiff's arm for approximately 50 seconds.  *Id.* at 743.

9    There, it took another twenty seconds after the dog bite ended for officers to drag the plaintiff

10   from his car.  *Id.* at 745-46.  The Ninth Circuit found that though "based on [plaintiff]'s

11   continuing resistance here as shown on the video recording, a reasonable officer in the position of

12   [the officer involved] would not view [plaintiff's] conduct as an act of surrender."  *Id.*  The Ninth

13   Circuit also noted that the plaintiff's briefing made "no attempt to discuss his resistance after the

14   dog bite."  *Id*.

15        This case is distinguishable from the instant case, where the parties have submitted the

16   undisputed fact that Defendant Crain ordered Mr. Woodral to get on his stomach and Mr.

17   Woodral complied.  (UF ¶ 12.)  Plaintiffs have additionally submitted evidence that Mr. Woodral

18   begged Defendant Crain to get the dog off of him and told Defendant Crain that he was not trying

19   to run anymore.  (PSSUF ¶¶ 16-17.)  Unlike the plaintiff in *Hernandez* who continued resisting

20   even after the police dog stopped biting him, Mr. Woodral complied with Defendant Crain's

21   instructions for some time while K9 Colt's bite continued.  Thus, Defendants' argument does not

22   support a finding of resistance or evasion and a genuine dispute remains regarding this factor.

23            **c.  Balancing**

24        As discussed, there are genuine disputes of material fact concerning at least the severity of

25   the intrusion element, the threat to safety factor, and the active resistance factor.  Disputed factual

26   issues remain as to the length of time that K9 Colt's bite continued between Mr. Woodral's

27   compliance with officer instruction, Defendant Crain's arrival, and Deputy Prasad's handcuffing

28   of Mr. Woodral.  (PSSUF ¶¶ 14-19, DDUF ¶ 27.)  Thus, a reasonable fact finder could disagree

1   as to whether Defendant Crain used objectively reasonable force.  Therefore, the Court finds there

2   is a genuine dispute of fact as to whether Defendant Crain used unreasonable force.

3               **2.  Qualified Immunity**

4               Defendants contend that Defendant Crain is entitled to qualified immunity on Plaintiffs'

5   claims of excessive force as Defendant Crain did not violate Mr. Woodral's constitutional rights

6   and a right is not clearly established.  (Doc. 31-1 at 17-19.)  Plaintiffs in turn argue that there was

7   a constitutional violation and a clearly established right.  (Doc. 38 at 13-16.)

8               The doctrine of qualified immunity shields individual officers "from liability for civil

9   damages insofar as their conduct [did] not violate clearly established ... constitutional rights of

10  which a reasonable person would have known."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)

11  (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  The court applies a two-prong

12  analysis in qualified immunity cases, "under which summary judgment is improper if, resolving

13  all disputes of fact and credibility in favor of the party asserting the injury, (1) the facts adduced

14  show that the officer's conduct violated a constitutional right, and (2) that right was 'clearly

15  established' at the time of the violation."  *Kirkpatrick v. Cty. of Washoe*, 843 F.3d 784, 788 (9th

16  Cir. 2016) (en banc).

17              **a.  Violation of a Constitutional Right**

18              As to the constitutional right violation, the Court has found that material issues of fact

19  exist with respect to the objective reasonableness of Defendant Crain's use of force during the

20  seizure and arrest of Mr. Woodral.  The Court recognizes that the presence of disputed facts,

21  alone, does not provide a sufficient basis for denying summary judgment on the issue of qualified

22  immunity.  *See Saucier v. Katz*, 533 U.S. 194, 200 (2001).  However, "unresolved issues of fact

23  are also material to a proper determination of the reasonableness of the officers' belief in the

24  legality of their actions."  *Espinosa*, 598 F.3d at 532.

25              **b.  Clearly Established Constitutional Right**

26              On whether the right was clearly established, the Court must determine whether the

27  constitutional right is clearly established such that a reasonable officer would have known that the

28  challenged conduct was unlawful. *Pearson*, 555 U.S. at 231.  To do so, courts survey the judicial

24

1  landscape to determine if the right was clearly established in the caselaw prior to the date of the

2  incident.  *Id.* at 244.  A clearly established law is not defined "at a high level of generality."

3  *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011).  Instead, the law should be sufficiently

4  particularized to "demonstrate whether the violative nature of particular conduct is clearly

5  established."  *Id.*  However, a finding of clearly established law does not require a factually

6  identical case, but rather "existing precedent must have placed the statutory or constitutional

7  question beyond debate."  *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quoting *Ashcroft*, 563 U.S. at

8  741).

9       In this instance, the Fourth Amendment right to be free from unreasonable seizure and the

10  use of excessive force is well defined.  The contours of the right as related to the use of a police

11  dog have been clearly established in the Ninth Circuit since at least 1994.  *See Mendoza v. Block*,

12  27 F.3d 1357, 1362 (9th Cir. 1994); *Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994); *Watkins*,

13  145 F.3d 1093 (9th Cir. 1998).  In *Mendoza*, officers searched for the plaintiff for several hours

14  before releasing a police dog.  *Mendoza*, 27 F.3d at 1358.  The dog then found the plaintiff and

15  dragged him from where he hid.  *Id.*  While the plaintiff was "spread-eagle" on the ground and

16  handcuffed, the dog switched its bite to the other side and injured him again.  *Id.*  When the

17  plaintiff begged officers to remove the dog, they told him to "shut [his]… mouth."  *Id.*  While the

18  Ninth Circuit noted that there were then "few cases in which the appropriate use of police dogs is

19  addressed…" "[t]his does not mean, however, that there was no clearly established law that

20  would indicate to the deputies that a constitutional right might be violated when using a dog

21  during an arrest."  *Id.* at 1361-62.  The Ninth Circuit ultimately found that "no particularized case

22  law is necessary for a deputy to know that excessive force has been used when a deputy sics a

23  canine on a handcuffed arrestee who has fully surrendered and is completely under control."  *Id.*

24  at 1362.

25       The Ninth Circuit further developed the law regarding excessive duration of a police dog

26  bite in *Watkins*.  In that case, a K9 unit responded to a silent alarm at a commercial warehouse, a

27  warning was given, and a police dog was released into the warehouse.  *Watkins*, 145 F.3d at 1090.

28  The dog found and bit the plaintiff.  *Id.*  An officer arrived at the plaintiff's location and ordered

1    him to show his hands while the dog continued its bite.  *Id.*  The plaintiff could not comply, as he

2    was recoiling from the dog bites.  *Id.*  The officer then pulled the plaintiff from his hiding place

3    onto the ground, where the dog continued biting the plaintiff until he showed his hands.  *Id.*

4    There, where the plaintiff claimed the officer "continued to allow [the dog] to bite him even

5    though he was obviously helpless and surrounded by police officers with their guns drawn," the

6    Ninth Circuit held that "it was clearly established that excessive duration of the bite and improper

7    encouragement of a continuation of the attack by officers could constitute excessive force that

8    would be a constitutional violation" and affirmed the district court's denial of qualified immunity.

9    *Id*. at 1090, 1093.

10          The Ninth Circuit continues to recognize that unnecessarily prolonged police dog bites

11   can constitute excessive force.  *See Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994); *Smith*,

12   394 F.3d at 702 (9th Cir. 2005), disapproved on other grounds by *Lemos v. Cnty. of Sonoma*, 40

13   F.4th 1002 (9th Cir. 2022)*; Lowry v. City of San Diego*, 858 F.3d 1248, 1256 (9th Cir. 2017).

14   Accordingly, when these events occurred in 2019, it was clearly established that the use of a

15   police dog for an unnecessary duration could constitute excessive force.

16          Ultimately, because the determination of qualified immunity requires an inquiry into

17   whether reasonable officers could have believed their conduct lawful under the particular

18   circumstances, the Court cannot resolve the legal question of qualified immunity until after the

19   jury resolves the factual issues surrounding Defendant Crain's use of force against Mr. Woodral.

20   Because the Court cannot resolve the questions regarding reasonable force and qualified

21   immunity at this stage, the Court DENIES Defendants' motion for summary judgment as to

22   Plaintiffs' claim for excessive force.

23          **B.  *Monell* Claim Against Defendant Stanislaus County**

24          A municipality, such as Defendant Stanislaus County, cannot be held liable under section

25   1983 for the acts of its employees under the theory of respondeat superior.  *Bryan Cty. v. Brown*,

26   520 U.S. 397, 403 (1997); *Monell v. Dept. of Social Servs. of City of New York*, 436 U.S. 658,

27   691 (1978).  A *Monell* claim of municipal liability may involve: (1) implementation of official

28   policies or established customs that inflict constitutional injury; (2) acts of omission amounting to

1    a policy, custom, or practice of "deliberate indifference" to constitutional rights; or (3) ratification

2    of a subordinate's unconstitutional conduct by a local government official with final policy-

3    making authority. *Clouthier v. Cty. of Contra Costa*, 591 F.3d 1232, 1249-50 (9th Cir. 2010),

4    overruled in part on other grounds in *Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1070 (9th Cir.

5    2016).  The Ninth Circuit has explained that, in the context of police dog excessive force cases,

6    the plaintiff "must demonstrate first that his seizure by [the dog] was unconstitutional and second

7    that the city was responsible for that constitutional wrong." *Chew*, 27 F.3d at 1439.

8        **1.  Policy, Custom, or Practice**

9        Plaintiffs contend that they are entitled to summary adjudication based on the Defendant

10   Stanislaus County's purported custom or practice to permit and train officers to allow a police

11   dog to stay on a bite even after a suspect complies with officer directions.  (Doc. 32 at 14-16,

12   Doc. 38 at 21-26.)  The Ninth Circuit requires a plaintiff to "'establish: (1) that he possessed a

13   constitutional right of which he was deprived; (2) that the municipality had a policy; (3) that this

14   policy 'amounts to deliberate indifference' to [plaintiff]'s constitutional right; and (4) that the

15   policy is the 'moving force behind the constitutional violation.'" *Boss v. City of Mesa*, 746 F.

16   App'x 692, 695 (9th Cir. 2018) (citing *Oviatt ex rel. Waugh v. Pearce*, 954 F.2d 1470, 1474 (9th

17   Cir. 1992)).  In the *Monell* context, a "policy" is a "deliberate choice to follow a course of

18   action...made from among various alternatives by the official or officials responsible for

19   establishing final policy with respect to the subject matter in question." *Fogel v. Collins*, 531 F.3d

20   824, 834 (9th Cir. 2008); *Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006).

21       For the first element of whether Mr. Woodral was deprived of a constitutional right,

22   Plaintiffs' argument is derivative of their excessive force argument.  On the second, third, and

23   fourth elements regarding Defendant Stanislaus County's alleged policy, Plaintiffs principally

24   support their argument with reference to Defendant Crain's deposition.  (UF ¶ 15, Doc. 31-2 at

25   82-83.) (Q. So it was in conformance with your policy and training to continue to allow the dog to

26   stay on the bite while you waited for Deputy Prasad to draw closer, correct?  A. That is correct.

27   Q. You're trained that -- and you can tell me if I'm wrong. You're trained this [sic] if a person is

28   compliant you are not permitted to continue using force against them, right?  A. That's correct.)

1  Plaintiffs essentially contend that Defendant Crain's practice or custom of permitting the dog to

2  continue to hold on the bite inflicts a constitutional injury and constitutes the policy of Defendant

3  Stanislaus County.

4         Defendants dispute Plaintiffs' characterization of a policy based upon citation to the

5  Canine Program section of the Stanislaus County Sheriff's Department Policy Manual, which

6  states: "Once the individual has been located and no longer reasonably appears to represent a

7  threat or risk of escape, the canine should be placed in a down-stay or otherwise secured as soon

8  as it becomes reasonably practical." (Doc. 31-4, Ex. C to Declaration of Jill Nathan).  Defendants

9  further point to Defendant Crain's belief that his actions fell within this policy and expert Bill C.

10 Lewis II's opinion that the Stanislaus County Sheriff's Department Canine Program meets

11 national law enforcement standards. (DSSUF ¶¶ 35, 37, 46-47).

12        While Defendants provide the written section of the Policy Manual, Plaintiffs do not cite

13 evidence of a formal governmental policy to permit police dogs to hold on a bite after a suspect

14 complies with officer directions, only pointing to Defendant Crain's actions and statement that he

15 believed his actions conformed with policy and training.  (Doc. 31-2 at 82-83.)  Plaintiffs

16 therefore lack evidence of a formal, deliberate choice made by an official responsible for

17 establishing final policy.  *See Fogel*, 531 F.3d at 834.  Accordingly, Plaintiffs have not satisfied

18 the second, third, and fourth elements required for *Monell* liability on this basis.  *Boss*, 746 F.

19 App'x at 695.

20        Absent a formal governmental policy, Plaintiffs must show a "longstanding practice or

21 custom which constitutes the standard operating procedure of the local government entity."

22 *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996).  The custom must be so "persistent and

23 widespread" that it constitutes a "permanent and well settled city policy."  *Id.*  (quoting *Monell*,

24 436 U.S. at 691). "Liability for improper custom may not be predicated on isolated or sporadic

25 incidents; it must be founded upon practices of sufficient duration, frequency and consistency that

26 the conduct has become a traditional method of carrying out policy."  *Id.*

27        Beyond this incident, Plaintiffs do not cite any other instances of police dogs being

28 permitted to hold on a bite after a suspect complies with officer directions.  The sole mention of

1  broader Stainslaus County Sherriff Deputies' practices comes in Plaintiffs' First Amended

2  Complaint, where Plaintiffs list different instances of alleged excessive force by the Stanislaus

3  County Sherriff Deputies.  (Doc. 18 ¶ 21.)  However, a party may not rely on references only to

4  its pleadings to oppose summary judgment.  *Celotex*, 477 U.S. at 325.  Accordingly, Plaintiffs fail

5  to demonstrate that excessive force by Stanislaus County K9 units is so "persistent and

6  widespread" as to be "permanent and well settled city policy" and have therefore not established

7  *Monell* liability on the basis of policy, custom, or practice.

8  **2.     Ratification**

9  Plaintiffs also appear to argue that *Monell* liability is appropriate based on the ratification

10  of Defendant Crain's conduct by officials.  (Doc. 18 ¶ 21.)  Although unclear, it appears that

11  Plaintiffs are attempting to impose liability Defendant Stanislaus County based on the lack of

12  discipline of Defendant Crain following the incident.  Defendants in turn argue that Plaintiffs

13  have not shown ratification by an authorized policymaker.  (Doc. 36 at 22-23.)

14  A *Monell* claim under a theory of ratification exists when "an official with final

15  policymaking authority ratified a subordinate's unconstitutional decision or action and the basis

16  for it." *Gillette v. Delmore*, 979 F.2d 1342, 1346-47 (9th Cir. 1992). "[R]atification requires,

17  among other things, knowledge of the alleged constitutional violation." *Christie v. Iopa*, 176 F.3d

18  1231, 1239 (9th Cir. 1999).  However, "[a] policymaker's knowledge of an unconstitutional act

19  does not, by itself, constitute ratification.... [I]t is well-settled that a policymaker's mere refusal to

20  overrule a subordinate's completed act does not constitute approval." *Id.*  Instead, there must be

21  "evidence of a conscious, affirmative choice."  *Gillette*, 979 F.2d at 1347.  Ratification requires

22  "'something more' than a single failure to discipline or the fact that a policymaker concluded that

23  the defendant officer's actions were in keeping with the applicable policies and procedures."

24  *Soares v. Cty. of Los Angeles*, No. 2:17-CV-00924-RGK-AS, 2018 WL 4896659, at *3 (C.D. Cal.

25  Apr. 25, 2018).

26  Here, despite raising the discipline and ratification issue in their First Amended

27  Complaint, Plaintiffs have not produced evidence or provided further discussion to support their

28  argument on ratification.  Defendants, in turn, argue that Plaintiffs have not shown Sergeant

1    LaBarbera, who reviewed and approved Defendant Crain's actions, to be an official with final

2    policymaking authority for Defendant Stanislaus County.  (DSSUF ¶ 34.)  Given that Plaintiffs

3    have not further discussed ratification in their briefing nor provided evidence of anyone with final

4    policymaking authority for Defendant Stanislaus County having ratified Defendant Crain's

5    actions, *Monell* liability based upon a ratification theory is also unwarranted.  *See Celotex*, 477

6    U.S. at 325; *Koistra v. Cnty. of San Diego*, 310 F. Supp. 3d 1066, 1085 n. 7 (S.D. Cal. 2018)

7    ("Because Plaintiff does not oppose municipal liability based on ratification, pattern or practice,

8    the Court GRANTS Defendants motion for summary judgment on these issues."); *Jenkins v.*

9    *Cnty. of Riverside*, 398 F.3d 1093, 1095 n.4 (9th Cir. 2005) (the plaintiff "abandoned her other

10   two claims by not raising them in opposition to the defendant's motion for summary judgment.").

11          Because Plaintiffs have not provided evidence to support the existence of policy, custom,

12   practice, or ratification of an unnecessarily prolonged police dog bite, the Court GRANTS

13   Defendants' motion for summary judgment as to Plaintiffs' *Monell* claim.

14          **C.      Plaintiffs' Bane Act Claim Against Defendants Crain and Stanislaus County**

15          Defendants seek summary judgment on Plaintiffs' Bane Act claim.  (Doc. 31-1 at 29 to

16   30.)  The Bane Act provides a right of action to "[a]ny individual whose exercise or enjoyment of

17   rights secured by the Constitution or laws of the United States, or of rights secured by the

18   Constitution or laws of [California] has been interfered with" by another person's "threats,

19   intimidation, or coercion." Cal. Civ. Code § 52.1(b)–(c).  To prove a case under the Bane Act, a

20   plaintiff must show "'a specific intent to violate the arrestee's right to freedom from unreasonable

21   seizure.'"  *Reese v. Cty. of Sacramento*, 888 F.3d 1030, 1043 (9th Cir. 2018) (citing *Cornell v.*

22   *City and County of San Francisco*, 17 Cal. App. 4th, 766, 801 (2017)).  A "mere intention to use

23   force that the jury ultimately finds unreasonable—that is, general criminal intent—is

24   insufficient." *Reese*, 888 F.3d at 1045 (citing *United States v. Reese*, 2 F.3d 870, 885 (9th Cir.

25   1993) (internal quotations omitted)).  Instead, "the jury must find that the defendants intended not

26   only the force, but its unreasonableness, its character as more than necessary under the

27   circumstances." *Id.*  (internal quotations omitted).  However, it is not necessary for defendants to

28   have been thinking in "constitutional or legal terms at the time of the incidents, because reckless

1   disregard for a person's constitutional rights is evidence of a specific intent to deprive that person

2   of those rights." *Id.* at 1045.

3        The inquiry into specific intent focuses on (1) whether "the right at issue [was] clearly

4   delineated and plainly applicable under the circumstances of the case"; and (2) whether the

5   "defendant commit[ed] the act in question with the particular purpose of depriving the citizen

6   victim of his enjoyment of the interests protected by that right." *Sandoval v. Cty. of Sonoma*, 912

7   F.3d 509, 520 (9th Cir. 2018), cert. denied sub nom. *Cty. of Sonoma v. Sandoval*, 140 S. Ct. 142

8   (2019) (internal quotations and citation omitted).  If both requirements are met, "specific intent

9   can be shown 'even if the defendant did not in fact recognize the unlawfulness of his act' but

10  instead acted in 'reckless disregard' of the constitutional right." *Id.* (citing *Cornell,* 17 Cal. App.

11  5th at 803).

12       Plaintiffs' and Defendants' arguments regarding summary judgment on Plaintiffs' Bane

13  Act claim are derivative of their excessive force arguments.  (Doc. 31-1 at 29-30; Doc. 38 at 27-

14  29.)  Because Plaintiffs' Bane Act claim is, at a minimum, predicated on the same facts as their

15  excessive force claim, and genuine disputes of fact exist with respect to that claim, summary

16  judgment cannot be granted.  Accordingly, the Court DENIES Defendants' motion for summary

17  judgment on Plaintiffs' Bane Act claim.

18       **D.      Plaintiffs' Remaining State Law Claims Against Defendants Crain and**

19  **Stanislaus County**

20       Defendants seek summary judgment on each of Plaintiffs' state law claims, including

21  those for battery and negligence.  (Doc. 31-1 at 29.)

22            **1.    Battery**

23       Under California law, "claims for assault and battery against peace officers should be

24  resolved under the same liability standard as 42 U.S.C. § 1983 excessive force causes of action."

25  *Briley v. City of Hermosa Beach*, No. CV05-8127AG(SHX), 2008 WL 4443894, at *3 (C.D. Cal.

26  Sept. 29, 2008) (citing *Saman v. Robbins*, 173 F.3d 1150, 1156 n. 6 (9th Cir. 1999) (applying the

27  same standard for excessive force for both federal and California law); *Susag v. Lake Forest*, 94

28  Cal.App.4th 1401, 1415 (2002) (adopting federal § 1983 standards for resolution of state law tort

claims against peace officers)); *Olvera v. City of Modesto*, 38 F.Supp.3d 1162, 1181 (E.D. Cal. 2014).  "Thus, if a court finds that police officers did not use excessive force against a plaintiff under federal law, it should also find no assault and battery under state law.  Alternatively, if a court finds that police officers did use excessive force against a plaintiff under federal law, it should find assault and battery under state law." *Briley*, 2008 WL 4443894, at \*3.

Defendants argue that Plaintiffs' battery claim fails as the force used was reasonable. (Doc. 31-1 at 29.)  Defendants' argument is derivative of their argument that Defendant Crain did not use excessive force under the Fourth Amendment.  As previously discussed, the Court has concluded that a reasonable jury could find that excessive force was used, and therefore, there is also a triable issue as to Plaintiffs' battery claim.  Accordingly, the Court DENIES Defendants' motion for summary judgment as to Plaintiffs' claim for battery.

### 2. Negligence

On January 6, 2023, the parties filed a stipulation of dismissal as to Plaintiffs' negligence claim against Defendants Crain and the County of Stanislaus.  (Doc. 62.)  Despite Plaintiff's earlier opposition to Defendants' motion for summary judgment on this claim, there is now no opposition.  Accordingly, the Court GRANTS Defendants' motion for summary judgment as to Plaintiffs' claim for negligence.

### VII.   Conclusion and Order

For the reasons stated, IT IS HEREBY ORDERED as follows:

1.   Plaintiffs' motion for partial summary adjudication is DENIED;

2.   Defendants' motion for summary judgment is GRANTED as to the following matters:

   a.   Plaintiffs' Second Claim for *Monell* liability against Defendant Stanislaus County; and

   b.   Plaintiffs' Fifth Claim for negligence against Defendants Stanislaus County and Nathan Crain;

3.   Defendants' motion for summary judgment is otherwise DENIED; and

4.   This matter is set for a STATUS CONFERENCE on **March 9, 2023, at 9:30 AM in Courtroom 8 (BAM) before the undersigned.**  The parties shall appear at the

conference with each party connecting <u>remotely</u> either via Zoom video conference or Zoom telephone number.  The parties shall be provided with the Zoom ID and password by the Courtroom Deputy prior to the conference.  The Zoom ID number and password are confidential and are not to be shared.  Appropriate court attire required.

IT IS SO ORDERED.

   Dated:   **February 15, 2023**                    /s/ *Barbara A. McAuliffe*
                                                 UNITED STATES MAGISTRATE JUDGE